# In the United States Court of Federal Claims

No. 19-1492C
(Filed: August 13, 2020)

| | |
|---|---|
| COLONEL JEFFERSON KASTER, <br><br> Plaintiff, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) |

Keywords: Military Disability; Department of the Navy; SECNAVINST 1850.4E; Informal Physical Evaluation Board; Formal Physical Evaluation Board; Secretary of the Navy Council of Review Boards; Integrated Disability Evaluation System (IDES).

*John B. Wells*, Slidell, LA, for Plaintiff.

*David R. Pehlke*, Trial Attorney, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, with whom were *Allison Kidd-Miller*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Joseph H. Hunt*, Assistant Attorney General, for Defendant. *Lieutenant Adam Sitte*, Office of the Judge Advocate General, Code 14, General Litigation, Department of the Navy, Washington Navy Yard, DC, Of Counsel.

## OPINION AND ORDER

**KAPLAN, Judge.**

In 2013, a Navy informal Physical Evaluation Board ("IPEB") found Marine Corps Colonel Jefferson Kaster unfit for duty as a result of post-traumatic stress disorder ("PTSD") and major depressive disorder. It concluded that the conditions had not stabilized and therefore recommended that he be placed on the Temporary Disability Retired List ("TDRL"). Col. Kaster disagreed with the IPEB's recommendation to place him on the TDRL rather than the Permanent Disability Retirement List ("PDRL"). He also disagreed with the IPEB's finding that several other medical conditions he had developed while in the service—including fibromyalgia, chronic fatigue syndrome, obstructive sleep apnea, and asthma—did not also render him unfit for duty or contribute to his unfitness.

Col. Kaster invoked his right to have his case heard de novo by a formal PEB, as guaranteed by 10 U.S.C. § 1214 and Secretary of the Navy Instruction ("SECNAVINST") 1850.4E. Although a hearing date was set, no formal PEB was ever held. The central question Col. Kaster has placed before the Court concerns the propriety of the Navy's determination that

during subsequent communications between the PEB and himself, or the PEB and his counsel, he waived the right he had earlier invoked.

For the reasons set forth below, the Court concludes that Col. Kaster did not waive his right to a formal PEB. The Navy's failure to afford him one was therefore arbitrary, capricious, and contrary to law. The Court, accordingly, will remand the case to the Secretary of the Navy Council of Review Boards ("CORB") with instructions to convene the formal PEB Col. Kaster was wrongly denied in 2013. In light of that disposition of the case, Col. Kaster's remaining claims, as well as the government's combined motion to dismiss and for entry of judgment on the administrative record as to those claims, are moot.

## BACKGROUND

**I.      The Navy's Disability Evaluation System**

**A.      <u>Overview</u>**

The retirement or separation of members of the military because of medical unfitness is governed by 10 U.S.C. Ch. 61. Section 1201(a) of Chapter 61 provides that "[u]pon a determination by the Secretary concerned that [an eligible service member] is unfit to perform the duties of the member's office, grade, rank, or rating because of physical disability incurred while entitled to basic pay . . . the Secretary may retire the member, with retired pay." 10 U.S.C. § 1201(a).

Service members are eligible for medical retirement where, among other things, their disability is permanent and they either have twenty years of service or their disability is rated at least thirty percent under the Department of Veterans Affairs Schedule for Ratings Disabilities ("VASRD"). 10 U.S.C §§ 1201(b)(1), (b)(3). If a member has less than twenty years of service and a disability that is rated lower than thirty percent, then he may be separated from the service with severance pay. 10 U.S.C. § 1203(a).

The Department of the Navy Disability Evaluation Manual (hereinafter "the Manual") governs the processing of disability cases for members of the Marine Corps.[1] Col. Kaster's case was subject to the 2002 version of the Manual (SECNAVINST 1850.4E).

The Manual provides that "the sole standard to be used in making determinations of physical disability as a basis for retirement or separation is unfitness to perform the duties of office, grade, rank or rating because of disease or injury incurred or aggravated while entitled to

---

[1] The Department of Defense ("DoD") has also promulgated several issuances which provide guidance to the military departments concerning the requirements of Chapter 61. <u>See generally</u> DoD Instruction 1332.18 (Aug. 2014) (updated in May 2018); Directive-Type Memorandum 11-015 – Integrated Disability Evaluation System (Dec. 2011); DoD Manual 1332.18 (Vol. 1) ("LDES Manual") (Aug. 2014); DoD Manual 1332.18 (Vol. 2) ("IDES Manual") (Aug. 2014).

basic pay." Id. encl. 3, ¶ 3301. It specifies that "[e]ach case is considered by relating the nature and degree of physical disability of the member to the requirements and duties that member may reasonably be expected to perform in his or her office, grade, rank or rating." Id. "Conditions that do not themselves render a service member Unfit for military service will not be considered for determining the compensable disability rating unless those conditions contribute to the finding of unfitness." Id. ¶ 3802(g).

## B.    The Evaluation Boards

The disability evaluation process begins with a Medical Evaluation Board ("MEB") finding that the service member's fitness for continued naval service is "questionable by reason of physical or mental impairment." Id. ¶ 3201(a); see also id. encl. 2, ¶ 2043. The MEB's purposes are "to evaluate and report on the diagnosis; prognosis for return to full duty; plan for further treatment, rehabilitation, or convalescence; estimate of the length of further disability; and medical recommendation for disposition of such members." Id. ¶ 2043.

After the MEB issues its findings, it may refer the case to the PEB for further evaluation. See id. encl. 3, ¶ 3102(c). The PEB acts on behalf of the Secretary of the Navy in making fitness determinations. Id. encl. 1, ¶ 1004(a).

The first step in the process involves a record review conducted by an IPEB after it receives all necessary medical and non-medical information. Id. encl. 3, ¶ 3102(c); id. encl. 4, ¶ 4201. Upon reviewing the relevant records, including any produced by the Department of Veterans Affairs ("the VA"), the IPEB issues and provides the member with notice of its "preliminary findings" regarding whether any of the conditions the member claims render him unfit for continued military service. Id. encl. 1, ¶ 1004(b); id. encl. 3, ¶ 3102(c); id. encl. 4, ¶¶ 4208–11.

The VASRD is used to assign a rating to the unfitting conditions the IPEB identifies. See, e.g., id. encl. 3, ¶ 3803. Under the Integrated Disability Evaluation System ("IDES") to which Col. Kaster was subject, the DoD and VA evaluation processes are combined, and "a single set of disability examinations" is performed. IDES Manual encl. 3, ¶ 1. Further, while "[t]he [informal] PEB and [formal] PEB determine a Service member's fitness," they "do not assign disability ratings to conditions." Id. encl. 4 App. 10, ¶ 1. Instead, with limited exceptions, the Navy applies the VA's disability rating determinations for all conditions the Navy finds are unfitting.[2]

---

[2] By contrast, under the Legacy Disability Evaluation System ("LDES"), DoD Instruction 1332.18 ¶ 3(b), the DoD conducts medical examinations, makes MEB and PEB findings, and assigns disability ratings for a service member's conditions based on its own application of the VASRD. See DoD LDES Manual encl. 4, ¶¶ 1(b), (d)(1). If a service member is placed on the LDES track, he may seek VA benefits independently but, unlike the IDES system, DoD is not bound by the ratings the VA assigns.

After the IPEB completes its review, it refers the case to the President of the PEB for further processing. SECNAVINST 1850.4E encl. 4, ¶ 4212(a). The President of the PEB is required thereafter to assign to a formal PEB "all cases of members found Unfit to continue naval service in which the member demands a hearing." Id. ¶ 4212(c).

A claimant is given fifteen days after he receives notification of the IPEB's preliminary findings to either accept those findings or request reconsideration from the IPEB "and/or demand/request a personal appearance before a formal PEB." Id. encl. 3, ¶ 3102. If the member accepts the findings of the IPEB, the case is finalized and the service's headquarters will separate, retire, or return the

disability claimant to duty accordingly. Id. If he fails to make an election within fifteen days, then acceptance of the findings is presumed on the sixteenth day after he receives them. Id.; see also id. encl. 4, ¶ 4216.

Where a service member invokes his right to a formal PEB, the board will hold a hearing during which the claimant may submit evidence and call witnesses. See id. ¶¶ 4327, 4328. All claimants with cases pending before a formal PEB are entitled to representation by a military lawyer, who is independent from the board. Id. ¶¶ 4310, 4311. Though a claimant maintains the right to personally appear before the board for the hearing, if that right is waived, his military counsel may present the case on his behalf. Id. ¶ 4314. The formal PEB reviews the hearing evidence along with other applicable evidence (set forth in id. ¶ 4330) and issues a de novo eligibility determination whether the service member's claimed conditions render him unfit for continued military service. Id. ¶ 4331.

"The Formal PEB's findings are subject to an automatic review for administrative and legal sufficiency before issuance by the President [of the] PEB." Id. ¶ 4336(a)(1). If the claimant disagrees with the findings of the formal PEB, he may file a petition for relief with the Director, Naval Council of Personnel Boards. Id. encl. 1, ¶ 1004(h); id. encl. 3, ¶ 3102(c). A claimant who has been separated or permanently retired also has the right to petition the Board for Correction of Naval Records for review after final action on his or her case. Id.

When an informal or formal PEB concludes that a member is unfit for service, it must determine whether an unfitting condition is permanent, i.e., whether "the nature and degree of the condition render the member unable to continue naval service within a reasonable period of time (normally 8–12 months or less)." Id. ¶ 3102(a). Where the PEB finds that the unfitting condition has not stabilized, the service member may be placed on the TDRL. See 10 U.S.C. § 1202. A disability is "considered unstable when the preponderance of medical evidence establishes that accepted medical principles indicate[] the severity of the condition will change within the next 5 years so as to result in an increase or decrease of the disability rating percentage or a finding of Fit." SECNAVINST 1850.4E encl. 3, ¶ 3601(a). Under the statutory provision in effect at the time Col. Kaster was placed on the TDRL, the maximum period of time a member might remain on the TDRL was five years. Id. ¶ 3605 (citing previous version of 10 U.S.C. § 1210).

Members placed on the TDRL are required to undergo physical examinations at least once every eighteen months. 10 U.S.C. § 1210(a); SECNAVINST 1850.4E encl. 3, ¶ 3606(a).

They must "provide to the examining physician, for submission to the PEB," copies of all civilian, VA, and military medical records that document treatment since the last TDRL reevaluation. SECNAVINST 1850.4E encl. 3, ¶ 3608. The PEB evaluates the relevant reports and determines whether the claimant's condition has resolved itself or otherwise stabilized. Id. ¶ 3622.

Conditions that are newly diagnosed during TDRL periodic physical examinations are not compensable under Chapter 61 upon finalization unless 1) the condition is unfitting and was caused by the condition for which the member was placed on the TDRL or directly related to its treatment; or 2) "the evidence of record establishes that the condition either was incurred while the member was entitled to basic pay, or as the proximate result of performing duty, whichever is applicable, and was an unfitting disability at the time the member was placed on the TDRL." Id. ¶ 3618(a).

Conditions that were not unfitting at the time of placement on the TDRL "shall be deemed unfitting due to the natural progression of the condition and noncompensable under chapter 61 of 10 U.S.C. . . . although the member may be eligible for benefits for these conditions under the []VA." Id. Therefore, "[i]nformal and formal PEBs" that are convened while the service member is on the TDRL "will not consider those diagnoses previously categorized" as not unfitting for continued military service. Id. ¶ 3618(b). In addition, "[a] member's disability rating will not be changed during the period a member is assigned to the TDRL." Id. ¶ 3622(a)(2). If the unfitting condition or conditions that put the member on the TDRL have not stabilized, he is retained on the TDRL.

## II.    Col. Kaster's Military Service and Medical Conditions

Col. Kaster is a retired member of the United States Marine Corps Reserve with over twenty years of military service. See Admin. R. ("AR") 1. He enlisted in the Marine Corps Reserves in November of 1989, id., and served in the Second Marine Division and the 6th Marine Corps regiment before being released from active duty in 1995, id. at 16, 25; Compl. ¶¶ 11–12. While in the Reserves, Col. Kaster attended and graduated from law school, earning his Juris Doctor degree in 2001. AR 153.

Col. Kaster, then a Major, was recalled to active duty in early 2003 in support of the War on Terror. See AR 30; Compl. ¶ 15. Throughout most of 2003, Col. Kaster served as a "Watch officer." AR 161. After graduating from the Naval Justice School in 2004, Col. Kaster was assigned as the Judge Advocate for the Preliminary Investigations Branch and served several deployments to Iraq. Id. at 19, 185, 191, 326. As part of his deployments, he investigated deaths, mass graves, terrorist crimes, suicide bombings, and other disturbing events. Compl. ¶ 17.

From October 2008 until September 2013, Col. Kaster, then a Lieutenant Colonel, was assigned to the Office of the Staff Judge Advocate at Marine Forces Central Command at MacDill Air Force Base in Tampa. AR 24, 255, 287. His primary responsibilities included reviewing death investigations for marines assigned to the Central Command in Iraq and Afghanistan. See, e.g., id. at 259, 574.

The medical conditions that are the subject of Col. Kaster's disability claims started as early as 2005 when he was diagnosed with chronic pain syndrome. Id. at 545. He was subsequently diagnosed with fibromyalgia on May 13, 2008, id. at 453, and in 2009, he began treatment for sleep apnea, see id. at 532, 723–25. The record also reflects continued treatment for chronic fatigue beginning as early as 2005. See id. at 493, 497, 532.

On January 1, 2012, Col. Kaster was placed on medical hold, id. at 323, and, on January 20, he underwent a neuropsychological evaluation which revealed symptoms of depression and anxiety, id. at 2019–23. Between March and April 2012, Col. Kaster received inpatient treatment at Emerald Coast Behavioral Hospital in Panama City, Florida over the course of several weeks for PTSD, general anxiety disorder, and major depression. Id. at 546–55.

## III.    IPEB

On June 29, 2012, Col. Kaster filed a VA/DoD Joint Disability Evaluation Board Claim (VA Form 21-0819). Id. at 542–44. Col. Kaster alleged that he was suffering from a number of unfitting conditions, including major depression, chronic PTSD, sleep apnea, traumatic brain injury, and chronic pain syndrome. Id.

On September 28, 2012, an MEB was convened to review Col. Kaster's medical records. Id. at 1829. The MEB found that since he began his military service Col. Kaster had developed a number of conditions, including major depression, chronic PTSD, sleep apnea, chronic pain syndrome, and asthma. Id. The MEB referred Col. Kaster's case to the PEB for further review. Id. at 1828.

On February 4, 2013, an IPEB concluded that Col. Kaster was "fit" for duty. Id. at 1826. Col. Kaster contested this preliminary finding on February 15, 2013. He submitted additional medical reports, including a report from a civilian psychiatrist who had been treating him since April 2011. Id. at 1715–16. He also invoked his right to a formal PEB. Id. at 1701–05.

A few days later, on February 19, 2013, the IPEB revisited and reversed its preliminary determination that Col. Kaster was fit for duty. Id. at 1825. It concluded that Col. Kaster suffered from two unfitting and "associated" conditions, specifically, major depression and PTSD. See id. at 1823–25. The IPEB found, however, that Col. Kaster's chronic fatigue syndrome, obstructive sleep apnea, and asthma were "not separately unfitting and d[id] not contribute to the unfitting condition(s)." Id. at 1823. According to the IPEB, treatment for these other conditions "ha[d] successfully diminished or resolved the symptoms sufficiently so that the member can perform the duties of his rank and MOS." Id. at 1696, 1824. The IPEB recommended that Col. Kaster be placed on the TDRL based on PTSD and major depression. Id. at 1824.

Some six weeks later, on April 4, 2013, the VA proposed a disability rating of seventy percent for Col. Kaster's PTSD (which it stated was "also diagnosed as major depressive disorder, moderate"). Id. at 1806. Relying on the VA's decision, on April 19, 2013 the IPEB updated its February report to reflect a seventy percent disability rating for PTSD and major depression as related and unfitting conditions. Id. at 1694–96 (April 19, 2013 IPEB findings). The IPEB reiterated its recommendation that Col. Kaster be placed on the TDRL based on these conditions. Id. at 1694.

**IV.      Request for Formal PEB**

On May 8, 2013, Col. Kaster executed a form entitled "Integrated Disability Evaluation System (IDES) IPEB Election of Options (EOO)." Id. at 1780–87. Through the form and a supporting personal statement, he rejected the IPEB's preliminary findings and requested a formal PEB hearing to contest them. Id. In the statement, he expressed his belief that his conditions were stable and that he should be placed on the PDRL. Id. at 1784. He further requested that the PEB reconsider the IPEB's determination that his "Chronic Fatigue Syndrome, aka Fibromyalgia" did not render him unfit for duty nor contribute to his unfitness. Id. He included new documentation from his pulmonologist regarding his obstructive sleep apnea, as well as email traffic between himself and his supervisor which he said showed that the condition was interfering with his ability to carry out his duties. Id. at 1785. His statement also described the effect of his chronic pain on his day-to-day functioning. Id. at 1786. In addition, he supplied new documentation regarding his asthma. Id. at 1787.

**V.      Col. Kaster is Denied a Formal PEB and is Placed on the TDRL on the Basis of the IPEB's Findings**

Consistent with Col. Kaster's May 8, 2013 invocation of his right to a formal PEB, a hearing was scheduled for Tuesday, June 25, 2013. See id. at 1699. The hearing, however, was not held. Nor did a formal PEB review either the medical documentation that the IPEB considered or Col. Kaster's personal statement and additional medical records.

Instead, a day before the hearing, the PEB Administrator emailed Maj. Carla Sloane, who had been assigned to serve as Col. Kaster's counsel in connection with the formal PEB. Id. The Administrator asked Maj. Sloane to "provide updates for tomorrow's hearings (including if the member travelled)." Id. Maj. Sloane responded by email several hours later. In her email, she represented that "Col. Kaster will be accepting his Informal PEB Results," but that he would be requesting reconsideration of his rating by the VA, which she stated he would submit the following Friday. Id.

Notwithstanding Maj. Sloane's representation, the next day (i.e., the day of the scheduled hearing), Col. Kaster did not "accept his Informal PEB results." Rather, he did the opposite. He executed and submitted to the President of the PEB an altered version of a standard form that is used by service members to accept the findings of an informal IPEB. Id. at 1700. He also placed his initials next to a line that on the original form read "I accept the findings of the IPEB, and in doing so waive my right to submit new/additional information concerning my fitness for continued service or [to] appear at a formal hearing." Id. But he made handwritten annotations to the language on the form so that it instead read "I accept the findings of the IPEB, WITH EXCEPTIONS & OBJECTIONS," and he crossed out the phrase stating that he "waive[d] [his] right to submit new/additional information concerning [his] fitness for continued service or [to] appear at a formal hearing." Id. And while he initialed a line stating that he was making the decision after consultation with counsel, he crossed out the next sentence, which stated "I am satisfied with my counsel in all respects and consider my counsel qualified to represent me before the PEB." Id.

Along with the form, so altered and initialed, Col. Kaster submitted a memorandum detailing his "exceptions to acceptance of the IPEB findings." Id. 526–29 (capitalization altered). He "specifically claim[ed] an exception to [the] portion of the Acceptance memo that reads '. . . and in doing so waive my right to submit new/additional information concerning my fitness for continued service or [to] appear at a formal hearing.'" Id. at 526. He affirmed that he did "not wish to waive anything" and that he sought "to affirmatively preserve any and all rights that may attach by function of statutory or regulatory action." Id.

In his statement, Col. Kaster also expressed his objections to the PEB's previous rejection of his requests to continue the hearing to allow him to undergo additional medical examinations. Id. at 527. Because his requests were denied, Col. Kaster stated, he was of the view that "there was no reason to appear physically before the [formal] PEB." Id. He also explained that he "could not acquire a DTS [(Defense Travel System)] account . . . [and thus] could not get travel orders" to attend the hearing. Id. at 528. Nevertheless, he stated, he was asserting a "constructive appearance" because he was concerned that if he did not physically appear at the hearing, his "ability to file a PFR [(Petition for Relief) would be] foreclosed." Id. at 527.

The record does not contain copies of Col. Kaster's previous requests for continuances or of any responses to those requests by the formal PEB. It also does not include any written response by the PEB to Col. Kaster's memorandum taking exception to the IPEB's decision. Instead, it includes a copy of the completed form as altered by Col. Kaster, with a line marked through it and the word "rejected" placed above the line in all caps. Id. at 1700. The initials of the individual who apparently affixed the word "rejected" are illegible.

Also included in the administrative record is a "memorandum for the record" dated July 9, 2013 and signed by Legalman Chief Petty Officer ("LNC") Alvin M. Brown. Id. at 1698. In it, LNC Brown references the statement in Maj. Sloane's email that Col. Kaster "w[ill] be accepting his IPEB findings." Id. He further notes, however, that although Col. Kaster did submit an election of options form, it "was submitted . . . with annotations made on his part." Id. "Accordingly," LNC Brown states, "the [formal] PEB did not accept the annotated findings and asked the member, via his attorney to submit another election of options without annotations." Id. at 1698. According to LNC Brown's memorandum, Col. Kaster, "[o]n [his] own accord . . . refused to submit another election of options." Id. "As a result," LNC Brown states, "the email [from his counsel] that was submitted on 24 Jun 13 stating the member will accept his IPEB findings will serve as the member's election of options and the case will [be] adjudicated accordingly." Id.

The Court notes that the administrative record contains no indication precisely what the PEB communicated to Col. Kaster about his options in the wake of his submission of the altered form, or whether the PEB communicated to him (or his counsel) verbally or in writing. There is also nothing in the record reflecting whether Col. Kaster was advised that if he did not submit another form (this time without annotations) the PEB would treat his attorney's email of June 24 as a withdrawal of his previous assertion of his right to a formal PEB.

In the meantime, consistent with Maj. Sloane's email, on July 12, 2013, Col. Kaster submitted a request for reconsideration to the VA regarding its April 4, 2013 decision proposing a seventy percent rating for his PTSD. See id. at 1673. Col. Kaster submitted additional

information along with his request, including an MEB report narrative summary, the results of a VA examination from August 2012, a personal statement, and a statement from his spouse. Id. at 1673–74. On August 1, 2013, the VA Decision Review Officer denied the request for reconsideration. Id. Thereafter, on August 5, 2013, Col. Kaster was officially transferred to the TDRL based on his PTSD and depression with an assigned rating of seventy percent. Id. at 1668.

## VI.   Subsequent PEBs and Eventual Disability Retirement

Col. Kaster underwent periodic medical examinations and his case was reviewed by the PEB on several occasions after he was initially placed on the TDRL. On August 25, 2015, an IPEB met to consider whether Col. Kaster remained unfit for duty and, if so, whether his condition had stabilized to the point that he should be placed on the PDRL and medically retired. Id. at 1505. The IPEB answered both questions in the affirmative. Id. At the same time, however, it recommended a reduction in the disability rating for his PTSD and major depressive disorder from seventy percent to thirty percent. Id.

Col. Kaster objected to these findings on September 11, 2015, and requested reconsideration by the IPEB. Id. at 1498. He subsequently requested a formal PEB, and a hearing was scheduled for December 9, 2015. Id. at 1469. The day before the hearing, Col. Kaster submitted a "Formal Hearing Petition," along with additional medical records. Id. at 1469–93. He requested a transfer to the PDRL based on his PTSD and fibromyalgia, and requested that he be assigned a combined disability rating of eighty percent. Id. at 1469.

The formal PEB held a hearing on December 9, 2015, at which Col. Kaster, his wife, and a former employer testified. Id. 1414–23. In a January 13, 2016 decision, the formal PEB found Col. Kaster unfit for duty based on major depressive disorder (with PTSD listed as a related condition), rated at thirty percent. Id. at 1414. It recommended that he be transferred from the TDRL to the PDRL. Id. It further found that Col. Kaster's fibromyalgia did not "preclude the continued performance of duties and [wa]s not separately unfitting or contributing to the unfitting condition." Id. at 1421.

On February 26, 2016, Col. Kaster filed a petition for relief from the PEB decision with the Director of CORB. See id. at 1035–36. The Director granted the petition in part. Id. He determined that Col. Kaster's PTSD and major depressive disorder had not stabilized and that he should be maintained on the TDRL with a seventy percent disability rating. Id. at 1035. The Director denied Col. Kaster's request for a second formal hearing, finding "no indication that [Col. Kaster was] not able to fully participate in the hearing." Id. at 1036. The Director also explained that because Col. Kaster did not raise the issues of unfitness based on sleep apnea/asthma, chronic fatigue syndrome, or irritable bowel syndrome before the formal PEB, they were not subject to review by the Council. Id.

On January 11, 2017, an IPEB conducted another periodic review of Col. Kaster's fitness. Id. at 916. It recommended that Col. Kaster be moved to the PDRL and assigned a fifty percent disability rating for major depressive disorder with PTSD as a related condition. Id. The same day, Col. Kaster rejected the recommendations and requested a formal PEB review of his case. Id. at 914.

The formal PEB hearing was held on June 21, 2017. Id. at 482. Col. Kaster requested that the PEB find him unfit for service due to PTSD/major depressive disorder/anxiety, fibromyalgia, chronic fatigue syndrome, and central sleep apnea. Id. He also requested that the PEB transfer him to the PDRL with disability ratings of seventy percent for his PTSD/major depressive disorder/anxiety, forty percent for his fibromyalgia, forty percent for chronic fatigue syndrome, and fifty percent for central sleep apnea, for a total combined rating of 100%. Id.

The formal PEB agreed that Col. Kaster should be transferred from the TDRL to the PDRL. Id. at 480. It assigned Col. Kaster a combined disability rating of fifty percent for his major depressive disorder and related PTSD. Id.

The PEB rejected Col. Kaster's arguments that his other medical conditions should also be found unfitting. Id. at 482–84. It found that Col. Kaster "failed to provide sufficient information to substantiate that [fibromyalgia rose] to the level of being unfit at the time of his placement on the TDRL" and that the medical record did "not establish a pattern of treatment for this condition that would suggest it impaired [him] from performing his duties." Id. at 483. The board reached the same conclusion regarding chronic fatigue syndrome, noting that the colonel found the drug "Nuvigil was useful for fatigue" and that the VA "did not consider Chronic Fatigue Syndrome to rise to a level of disability" in Col. Kaster's case. Id. (citing VA decision letter dated April 4, 2013). The board also concluded that sleep apnea was "a condition that is treatable and does not preclude a member from deployment, sea duty, or participation in physical training," and "is not considered in and of itself to be unfitting." Id. at 483–84. It further found that Col. Kaster "failed to provide sufficient information to substantiate that this condition [rose] to the level of being unfit at the time of his placement on the TDRL." Id. at 484.

Col. Kaster rejected the formal PEB's findings. Id. at 477. He submitted a petition for relief with CORB on September 19, 2017, id. at 369, which was denied on October 5, 2017, id. at 368. The Director of CORB concluded, however, that Col. Kaster's "unfitting condition ([PTSD]) [was not] sufficiently stable for rating purposes and therefore, require[d] further medical evaluation in order to ensure the assignment of the most appropriate disability rating." Id. He determined that Col. Kaster should remain on the TDRL. Id.

On October 6, 2017, notwithstanding the Council Director's determination, the President of the PEB sent a letter to the Commandant of the Marine Corps instructing that Col. Kaster be placed on permanent retirement with a fifty percent rating because the colonel's disability was "either permanent or five years [had] elapsed since the member's name was first placed on the TDRL." Id. at 367 (citing 10 U.S.C. § 1210). On October 12, 2017, the President cancelled the October 5 instructions and in their place issued another decision letter, this time directing that the Commandant of the Marine Corps retain Col. Kaster on the TDRL with the same disability rating that was assigned to him at the time he was placed on the TDRL—i.e., seventy percent. Id. at 365–66.

Around six months later, on April 18, 2018, the President of the PEB sent another decision letter to the Commandant of the Marine Corps. Id. at 340. This time, he instructed that Col. Kaster be transferred from the TDRL and permanently retired with a disability rating of seventy percent under VA Code 9434 (major depressive disorder). Id. Col. Kaster's permanent retirement became effective on May 10, 2018. Id. at 33.

## VII.     The Present Case

Col. Kaster filed his complaint in this Court on September 27, 2019. ECF No. 1. For his first cause of action, Col. Kaster alleges that—in violation of governing statutes and regulations, as well as the due process clause—he was not afforded a full and fair hearing before a formal PEB when he was placed on the TDRL in 2013. Compl. ¶¶ 81–101 (alleging violations of the Fifth Amendment, Secretary of the Navy Instruction 1850.4, 10 U.S.C. § 1214, and 5 U.S.C. § 555(e)). In addition, he claims that the IPEB that was held in 2015 was not properly constituted under governing regulations because it consisted of only two members, neither of whom were reservists. In his second cause of action, Col. Kaster alleges that Maj. Sloane, his assigned military counsel, was "ineffective resulting in a deprivation of due process directly resulting in a loss of pay and allowances under the Military Pay Act." Id. at 16. Finally, for his third cause of action, Col. Kaster claims that the PEB's determinations in 2017 regarding the rating of his PTSD and major depressive disorder were arbitrary, capricious, and contrary to law. Id. ¶¶ 125, 127–28.

The government filed the administrative record on January 31, 2020. ECF No. 9. On March 23, 2020, it filed combined motions to dismiss for failure to state a claim and for judgment on the administrative record. Def.'s Combined Mot. to Dismiss & Mot. for J. on the Admin. R. ("Def.'s MJAR"), ECF No. 12. Col. Kaster filed a cross-motion for judgment on the administrative record on May 18, 2020. See generally Pl.'s Opp'n to Def.'s MJAR & Cross-Mot. for J. on the Admin. R., ECF No. 15. Oral argument was held on the motions via videoconference on July 22, 2020.

## DISCUSSION

## I.     Jurisdiction

Under the Tucker Act, the Court of Federal Claims has jurisdiction to hear "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). While the Tucker Act waives the sovereign immunity of the United States to allow a suit for money damages, United States v. Mitchell, 463 U.S. 206, 212 (1983), it does not confer any substantive rights on a plaintiff, United States v. Testan, 424 U.S. 392, 398 (1976). Therefore, a plaintiff seeking to invoke the court's Tucker Act jurisdiction must identify an independent source of a substantive right to money damages from the United States arising out of a contract, statute, regulation, or constitutional provision. Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin., 525 F.3d 1299, 1306 (Fed. Cir. 2008).

It is well established that Section 1201 of Title 10 of the United States Code—which governs military disability retirement—is a money-mandating statute. Fisher v. United States, 402 F.3d 1167, 1174 (Fed. Cir. 2005) (citing Sawyer v. United States, 930 F.2d 1577 (Fed. Cir. 1991)). Accordingly, this Court has jurisdiction over Plaintiffs' claims seeking monetary relief based on the Military Pay Act.

## II.  Motions for Judgment on the Administrative Record

The standard for deciding a motion for judgment on the administrative record differs from that for a motion for summary judgment. See RCFC 52.1(c); Bannum, Inc. v. United States, 404 F.3d 1346, 1354–55 (Fed. Cir. 2005). Unlike summary judgment, for instance, "a genuine dispute of material fact does not preclude a judgment on the administrative record." Sierra Nevada Corp. v. United States, 107 Fed. Cl. 735, 751 (2012) (citing Bannum, 404 F.3d at 1355–56). To the contrary, "[t]o review a motion or cross-motions under RCFC 52.1(c), the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." Jordan Pond Co., LLC v. United States, 115 Fed. Cl. 623, 630 (2014) (citing Bannum, 404 F.3d at 1356–57); see also RCFC 52.1 rules committee note to 2006 adoption) ("Summary judgment standards are not pertinent to judicial review upon an administrative record."). "The existence of a question of fact thus neither precludes the granting of a motion for judgment on the administrative record nor requires this court to conduct a full blown evidentiary proceeding." CRAssociates, Inc. v. United States, 102 Fed. Cl. 698, 710 (2011) (citing Bannum, 404 F.3d at 1356).

## III.  Merits

Section 1214 of Title 10 of the United States Code provides that "[n]o member of the armed forces may be retired or separated for physical disability without a full and fair hearing if he demands it." This statutory requirement is implemented by SECNAVINST 1850.4E encl. 1, ¶ 1003(b). It states that "[n]o active duty member of the naval service, including reservists on extended active duty or reservists issued a Notice of Eligibility (NOE), may be retired or separated for physical disability without a Formal PEB if demanded under [10 U.S.C. § 1214]." See also SECNAVINST 1850.4E encl. 4, ¶ 4301(a) ("No active duty or reserve member of the naval service found Unfit by the Informal PEB may be retired or separated for physical disability without the right to a Formal PEB hearing.").

Notwithstanding these legal requirements, Col. Kaster was not afforded the formal PEB hearing he requested before he was placed on the TDRL in 2013. The government contends that Col. Kaster was not entitled to a formal PEB because he allegedly waived his right through counsel the day before the hearing scheduled in his case.

In determining whether a service member has waived his right to a formal PEB, the Court considers: 1) whether a waiver was executed; 2) the scope of the waiver; and 3) whether the waiver was knowing and voluntary. Cook v. United States, 123 Fed. Cl. 277, 305 (2015); see also Van Cleave v. United States, 402 F.3d 1341, 1344 (Fed. Cir. 2005). In this case, the Navy's determination that Col. Kaster knowingly or voluntarily executed a waiver of his right to a formal PEB in 2013 is not supported by substantial evidence and was contrary to law.

The Disability Evaluation Manual states that "[a]cceptance of the Informal PEB findings constitutes waiver of the right to a Formal PEB." SECNAVINST 1850.4E encl. 4, ¶ 4301(a) (citing 10 U.S.C. § 1214). Here, however, Col. Kaster rejected the IPEB's findings on May 8, 2013 and invoked his right to a formal PEB hearing. The PEB itself understood that Col. Kaster had rejected the IPEB's findings and invoked his right to have a formal PEB hear his case because it scheduled a hearing for that purpose the following month.

Further, although his counsel represented to the PEB Administrator the day before the hearing that "Col. Kaster will be accepting his informal PEB Results," AR 1699, he never in fact did so. Instead, as described in detail above, he did precisely the opposite. He submitted a form that—although entitled "Acceptance of IPEB Findings"—was annotated to register his exceptions to the IPEB's decision. And the form itself was accompanied by a memorandum explaining that Col. Kaster did "not wish to waive anything." See SECNAVINST 1850.4E encl. 4, ¶ 4301(d) (providing that "[s]ervice members requesting a Formal PEB should be encouraged to submit a rebuttal identifying the issues of disagreement with the Informal PEB's findings and recommendations").

Col. Kaster's intention to pursue formal PEB review could not have been clearer. To be sure, as the government notes, Col. Kaster stated that "there was no reason to appear physically before the [formal] PEB" because all of his requests for continuances had been denied. AR 526–27. But this was not a waiver of his right to review by the PEB; to the contrary, it was an objection to the formal PEB's refusal to grant him a continuance. And Col. Kaster sought to preserve his rights by asserting a "constructive appearance" at his PEB hearing, as expressly contemplated by SECNAVINST 1850.4E. See SECNAVINST 1850.4E encl. 4, ¶ 4314(b) (section entitled "Constructive Waiver" providing that the failure of a service member to appear before a formal PEB after due notification of the time and place of the hearing "shall be considered as a waiver by the member of his or her right to personally appear . . . [whereupon t]he hearing shall proceed 'in absentia'").

Further, the fact that Col. Kaster requested continuances of the June 2013 hearing to allow him to undergo additional examinations and submit additional records is inconsistent with the Navy's determination that he waived his right to a formal PEB. See AR 527. In that regard, it bears noting that the Court has no basis for finding that his requests for continuances were unjustified. For one thing, although the Manual requires that continuance requests be submitted in writing, SECNAVINST 1850.4E encl. 4, ¶ 4324(b), there are no copies of the requests themselves in the administrative record. Nor is there anything in the record that explains why those requests were denied.[3]

In any event, the reason the Navy provided for finding a waiver was not that Col. Kaster had expressed his intent not to attend the June 25, 2013 hearing. Rather, according to LNC

---

[3] In fact, as Col. Kaster explained in his June 25, 2013 statement, bureaucratic snafus appear to have impeded his ability to appear at the scheduled hearing. In particular, Col. Kaster's medical hold expired on May 31, 2013 and as of that date he was no longer considered to be on active duty. AR 527; see also Pl.'s Reply to Def.'s Opp'n to Pl.'s Cross-Mot. for J. on the Admin. R. ("Pl.'s Reply") at 4, ECF No. 20. As a result, according to Col. Kaster, he was unable to secure the travel orders he needed to attend his hearing through MCTFS (the Marine Corps Total Force System—the Marine Corps personnel system). See Pl.'s Reply at 4; Pl.'s Reply Ex. 3, ECF No. 20-1 (email between Col. Kaster and Chief Gene A. Wylie at the Jacksonville Navy Hospital); see also SECNAVINST 1850.4E encl. 3, ¶ 3111(b) ("Personal appearance before a board by active duty members is official business and shall be covered by orders providing for all of the appropriate travel expenses authorized by the [Joint Force Travel Regulations].")

Brown's memorandum for the record, the Navy relied upon Maj. Sloane's June 24, 2013 email as effecting a waiver of Col. Kaster's rights. LNC Brown thus represented that the formal PEB "did not accept the annotated findings," i.e., the form that Col. Kaster marked up to register that he objected to the IPEB's decision, "and asked the member, via his attorney to submit another election of options without annotations." AR 1698. LNC Brown further recounted that when the colonel declined to do so, the board relied on Maj. Sloane's email that the colonel would "be accepting his Informal PEB Results" as Col. Kaster's waiver of his right to a formal hearing. Id. (referencing id. at 1699); see also SECNAVINST 1850.4E encl. 4, ¶ 4301(a) (stating that "[a]cceptance of the Informal PEB findings constitutes waiver of the right to a Formal PEB." (citing 10 U.S.C. § 1214)).

The record does not contain any documentation showing precisely what the PEB allegedly communicated to Col. Kaster's counsel regarding the form he submitted or even who communicated it to her. It does not state who made the decision to treat the email as a waiver of Col. Kaster's rights. Nor does it contain any record of how or why Col. Kaster "refused" to submit a new form. For his part, Col. Kaster has represented to the Court that he was never told that he had been denied a formal PEB and that he thought that the PEB was still considering his case in July and August of 2013. Pl.'s Reply at 8.

The Court is also not persuaded by the government's contention that Col. Kaster's failure to submit another unannotated election of options form "operates as a presumed acceptance under the regulations." Def.'s Combined Reply in Supp. of Its Mot. to Dismiss & Resp. to Pl.'s Mot. for J. on the Admin. R. at 3, ECF No. 19 (citing SECNAVINST 1850.4E encl. 4, ¶ 4216). The regulations to which the government refers provide that "[i]f no response to the [IPEB findings] is received by the PEB within 15 calendar days [of the service member's receipt of the informal PEB's findings] . . . acceptance of the Informal PEB findings is presumed." SECNAVINST 1850.4E encl. 4, ¶ 4216. That regulation has no application because Col. Kaster did in fact respond to the findings of the IPEB by rejecting them and invoking his right to a hearing on May 8, 2013.

The government's reliance on this regulation reflects a misunderstanding of the issue before the Court. What is at issue is not the consequences of a failure to timely invoke a right to a formal PEB. It is whether the right to a hearing which Col. Kaster previously invoked and whose invocation the PEB recognized as proper, was later waived or withdrawn, a circumstance that is not addressed by the regulations the government cites.

The Court is also not impressed by the government's argument that Col. Kaster signaled his intent to waive a formal PEB when he wrote, in the memorandum appended to his amended acceptance form, that "there was no reason to appear physically before the [formal] PEB—I could not have requested anything additional in person I hadn't already asked for through counsel." See Def.'s MJAR 17 (quoting AR 527). At best, this statement by Col. Kaster could be read as a waiver of his right to appear at the hearing. See SECNAVINST 1850.4E encl. 4, ¶ 4314(a) (section entitled "Actual Waiver" providing that "[m]embers have the right to waive their personal appearance before a Formal PEB . . . [in which case] Counsel must represent the member during the hearing"). And even if neither Col. Kaster nor his counsel appeared at the hearing, under SECNAVINST 1850.4E, the hearing would "proceed 'in absentia' and the

Presiding Officer w[ould] include in the record a statement of the circumstances as well as evidence of notification." Id. ¶ 4314(b).

In short, the record does not reflect that Col. Kaster waived his right to have a formal PEB review his case before he was placed on the TDRL in 2013. The Navy violated Col. Kaster's statutory and regulatory rights when it denied him a formal PEB in 2013 and placed him on the TDRL on the basis of the IPEB's preliminary findings. And although several PEBs were held during the almost five years that Col. Kaster was on the TDRL, consistent with Navy regulations, the IPEB's findings in 2013 that only PTSD and major depressive disorder rendered Col. Kaster unfit for duty had the effect of preventing those subsequent PEBs from considering anew whether Col. Kaster's other medical conditions were also unfitting or contributed to his unfitness.

Because it is impossible to predict what the outcome would have been had Col. Kaster's procedural rights not been violated from the outset, the Court concludes that the appropriate remedy is to remand the case back to the Secretary of the Navy Council of Review Boards, with direction to provide Col. Kaster with the formal PEB he was wrongly denied in 2013. In light of the remand for these purposes, Col. Kaster's remaining challenges based on the composition of the 2015 IPEB, the alleged ineffectiveness of his counsel, and the propriety of the ratings assigned to his PTSD and major depressive disorder in 2017 are moot, as is the government's motion with respect to those claims.

## CONCLUSION

For the foregoing reasons, Col. Kaster's cross-motion for judgment on the administrative record is **GRANTED-IN-PART** and the government's cross-motion is **DENIED-IN-PART** as to his first cause of action, challenging the Navy's conclusion that he waived his right to a formal PEB hearing in 2013. Col. Kaster's remaining claims are **DISMISSED WITHOUT PREJUDICE AS MOOT**.

 The Court **REMANDS** the case to the Secretary of the Navy Council of Review Boards for a formal PEB hearing that will address Col. Kaster's claims: 1) that he should have been placed on the Permanent Disability Retired List in 2013 based on his PTSD and major depressive disorder; and 2) that the other conditions about which he complained at the time were also unfitting or contributed to his unfitness. Col. Kaster shall be permitted to submit additional medical, and other, evidence in support of his claims. The formal PEB must apply the disability ratings assigned by the VA should it find any of Col. Kaster's other conditions unfitting.

The remand proceedings must be completed within six months of the date of this decision. The parties shall file a joint report every sixty days advising the Court of the status of the proceedings on remand.

The Court will retain jurisdiction over the case during the course of the proceedings on remand. The Court **STAYS** proceedings in the instant case during that time.

Pursuant to RCFC 52.2(e), the parties shall file notice with the Court within thirty days of the Council's decision on remand stating whether that decision affords a satisfactory basis for the disposition of the case and whether the parties require further proceedings before the Court.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge